# AFFIDAVIT

I, CLAY R. MCCAUSLAND, a Special Agent (SA) of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), United States Department of Justice, being duly sworn under oath, hereby depose and state:

1. I am a law enforcement officer of the United States, and under 18 U.S.C. § 3051. I am empowered by the Attorney General to conduct investigations, enforce criminal, seizure, and forfeiture provisions of the laws of the United States, carry firearms, serve warrants and subpoenas issued under the authority of the United States, make arrests without a warrant for any offense against the United States committed in my presence, and make arrests for a felony offense under the laws of the United States if there are reasonable grounds to believe that the person to be arrested has committed or is committing such a felony.

2. I am employed as a Special Agent with ATF and have been so since October 2015. I am presently assigned to ATF's Cleveland Field Office. I am a graduate of the ATF National Academy, located at the Federal Law Enforcement Training Center in Glynco, Georgia. The ATF National Academy consists of 16 weeks of training regarding subjects such as firearms trafficking, unlawful possession of firearms and ammunition, unlawful dealing in firearms, unlawful possession and/or use of explosives, improvised explosive devices, arson investigations, execution of arrest and search warrants, and criminal procedure.

3. I was previously employed as a Special Agent with the Drug Enforcement Administration (DEA), from March 2008 through January 2011. I am a graduate of the DEA Academy at Quantico, VA, which involved 19 weeks of training in controlled substance distribution and trafficking investigations. I received training on topics such as drug identification, money laundering techniques, patterns of drug distribution and trafficking, the

exploitation of telecommunication devices utilized by drug traffickers, Federal law pertaining to violations of controlled substances, and drug distribution and trafficking conspiracy investigations.

4. Additionally, I previously served as a Federal Air Marshal for the U.S. Department of Homeland Security (DHS), Federal Air Marshal Service (FAMS), for six months. I also served for over two years as an intelligence analyst for Baltimore/Washington High Intensity Drug Trafficking Area (HIDTA), assigned to DEA's Washington Division Office.

5. I have conducted numerous investigations involving the possession, distribution, and trafficking of controlled substances, in addition to the concealment of illicit proceeds from the sale of the controlled substances, violation of Federal firearms and explosives laws, and use of firearms in furtherance of drug trafficking. In conducting these investigations, I have utilized a variety of investigative techniques and resources, including but not limited to surveillance, confidential informants, controlled purchases, electronic surveillance, exploitation of telephone and social media data, the interception of wire communications under Title III, interviews, and the review of financial documents.

6. The facts contained in this Affidavit are based upon my personal knowledge of the investigation, in addition to my general knowledge, training, and experience, and the observations, knowledge, training, and experience of other officers and agents. All observations referenced below that were not personally made by me, were relayed to me by those who made such observations, either verbally or via reports written by those agents and/or officers. Law enforcement surveillance referenced in this Affidavit may include the use of electronic surveillance.

7. This Affidavit contains information necessary to support probable cause for this application. It is not intended to include each and every fact and matter observed by me or law enforcement or known to the government, or serve as verbatim or transcribed accounts of interviews referenced in the affidavit.

## PROBABLE CAUSE

8. On June 19, 2019, U.S. Magistrate Judge Kathleen B. Burke approved a document search warrant for a residence known to be used by MICHAEL W. HUMPHRIES, 1675 Rockford Street, Akron, Ohio, hereinafter "1675 Rockford Street." The search warrant sought evidence of violations of Federal firearm and controlled substance laws.

9. On June 20, 2019, at approximately 6:05 AM, ATF and other law enforcement agency partners executed the search warrant at 1675 Rockford Street. Upton making entry into the residence, ATF made contact with HUMPHRIES, Natasha Taylor, identified as HUMPHRIES' girlfriend, and two juvenile children.

10. During a search of the southwest room on the main level of the residence, Federal Bureau of Investigation (FBI) SA Tim Edquist located four rounds of Winchester brand, 12 gauge shotgun ammunition, in a shoebox. Inside the same shoebox were other items, including two containers of male deodorant and a City of Cuyahoga Falls "CFOne" card with the name "Michael HUMPHRIES" written on the back of the card. A search of the southwest room also produced other documents bearing HUMPHRIES' name, including an Ohio Department of Rehabilitation and Correction (ODRC) Offender Release Card and State of Ohio Bureau of Motor Vehicles documents. Law enforcement officers also located documents and financial instruments bearing the names of known associates of HUMPHRIES.

11. On June 20, 2019, at approximately 6:22 AM, ATF SA John Fisher and ATF Task Force Officer (TFO) TFO John Christie conducted an interview of HUMPHRIES. At the onset of the interview, SA Fisher advised HUMPHRIES of his Miranda Rights by reading from a printed Miranda Warning card. HUMPHRIES then began asking SA Fisher and TFO Christie about the search warrant. HUMPHRIES was advised that he was detained. SA Fisher asked HUMPHRIES to sign a written Miranda rights waiver. HUMPHRIES refused to sign the waiver, but continued to speak with law enforcement. The interview was audio recorded.

12. During the interview, TFO Christie spoke with HUMPHRIES about a search warrant that ATF was also conducting that morning at 391 Fuller Street, Akron, Ohio, hereinafter "391 Fuller Street." Items seized from 391 Fuller Street included four semi-automatic pistols and ammunition. HUMPHRIES admitted to visiting 391 Fuller Street, but denied possessing firearms at 391 Fuller Street. HUMPHRIES acknowledged that he was a convicted felon.

13. SA Fisher and TFO Christie then asked HUMPHRIES if the firearms recovered from 391 Fuller Street would contain his fingerprints or DNA. HUMPHRIES again denied ever possessing a firearm at 391 Fuller Street. TFO Christie asked HUMPHRIES, "What about ammunition?" HUMPHRIES replied, "Well ammunition, yeah you go, people shoot guns all the time. Like I went to the uh shooting range. Ammunition, yeah." HUMPHRIES then denied possessing any ammunition or firearms magazines at the residence. SA Fisher then advised HUMPHRIES that he was being interviewed by federal agents and that it is illegal to lie to federal agents.

14. TFO Christie then asked HUMPHRIES again if he had ever been in possession of any firearms, ammunition, or magazines containing ammunition at 391 Fuller Street. TFO

4

Christie advised HUMPHRIES that he had previously observed HUMPHRIES in possession of those items in the rear parking lot of 391 Fuller Street. HUMPHRIES then repeated several times, "Was it real though?"

15. SA Fisher asked HUMPHRIES which room was his inside 1675 Rockford Street. HUMPHRIES pointed to a room, identified as the southwest room on the first floor of the residence. As noted above, this is the room from which four rounds of Winchester brand 12 gauge ammunition were seized. HUMPHRIES indicated that he and Taylor slept upstairs with the children, but he kept his belongings in the southwest room on the first floor of the residence.

16. SA Fisher asked HUMPHRIES if everything in the residence (1675 Rockford Street) belonged to him. In response, HUMPHRIES said, "Ours." HUMPHRIES said that when he moved into the house (1675 Rockford Street) a couple of months prior there were still belongings in the residence, but he threw all of that away.

17. SA Fisher asked HUMPHIRES if he had a shotgun. HUMPHRIES stated that he did not. SA Fisher asked HUMPHRIES, "You're a felon, right?" and HUMPHIRES replied, "Yeah." SA Fisher advised HUMPHRIES that shotgun ammunition had been discovered inside the residence.

18. HUMPHIRES claimed that the ammunition was from when he went to the shooting range and that they (the ammunition) had been there for a long time. HUMPHRIES explained that he kept all kinds of items in boxes.

19. SA Fisher asked HUMPHRIES if he previously owned a shotgun and he stated, "A long time ago. Like in 2012. When I first got out of prison." HUMPHRIES indicated that he no longer had the firearm and he had taken it to the shooting range. HUMPHRIES then said that

he took the ammunition out of one of his previous vehicles and put them in the box. HUMPHRIES stated when he goes to the range he goes by himself and rents a firearm to shoot.

20. TFO Christie had stepped away from the interview with SA Fisher, and then returned. Upon returning, TFO Christie asked HUMPHRIES about the ammunition that was located in 1675 Rockford Street. TFO Christie asked HUMPHRIES if it was his ammunition and HUMPHRIES stated, "No it's not. It's just some ammunition I had. Didn't even know I had though…It's in my possession though so I guess it gotta be mine." TFO Christie then asked HUMPHRIES if he knew he was prohibited from possessing ammunition and HUMPHRIES stated, "Yeah."

21. On July 24, 2019, TFO Christie received an incoming telephone call on his work cellular telephone for an unidentified telephone number. The caller identified himself as HUMPHRIES. TFO Christie placed the call with HUMPHRIES on speakerphone, so that I was also able to speak with HUMPHRIES. I advised HUMPHRIES that the call was now on speakerphone and that HUMPHRIES was speaking with both TFO Christie and I. SA McCausland audio recorded the telephone conversation.

22. During the call, HUMPHRIES asked, "When ya'll came in my home, did ya'll find any guns, drugs, or anything like that?" I responded that ammunition was found at HUMPHRIES' residence (1675 Rockford Street). HUMPHRIES responded, "Man you found some shotgun shells from like 10 years ago that was in the box." I asked HUMPHRIES if those were his shotgun shells. HUMPHRIES responded, "No, they been in that shoebox forever." HUMPHRIES went on to say that when one of his friends went to jail he grabbed all of his belongings and that the shotgun shells had been in the box forever. I asked HUMPHRIES which friend of his had gone to jail. HUMPHRIES responded that a lot of people went to jail.

23. I advised HUMPHRIES that he was a felon and not allowed to have ammunition. HUMPHRIES responded, saying he had never been to federal prison. I advised HUMPHRIES that he is a felon and is prohibited under federal law from being able to possess firearms and ammunition. HUMPHRIES responded, "Okay, well, well, well, I'm guilty of that then, so then why haven't I been to jail or nothing?" I asked HUMPHRIES if he was saying he was guilty of possessing that ammunition. HUMPHRIES then responded that I was telling him that he was guilty of possessing the ammunition and that he was saying the ammunition wasn't his ammunition and had been in the shoebox forever.

24. I asked HUMPHRIES if he visits shooting ranges. HUMPHRIES responded that he had been to the shooting range "a long time ago." I advised HUMPHRIES that when law enforcement spoke with HUMPHRIES on the day of the search warrant at 1675 Rockford Street, I thought HUMPHRIES made it sound like HUMPHRIES went to the shooting range regularly. HUMPHRIES responded, "I'm allowed to go to the shooting range, ain't I?" I again advised HUMPHRIES that felons are not allowed to have firearms, and then spoke with HUMPHRIES about how he would be possessing a firearm while at a shooting range. HUMPHRIES said he had never not been allowed to shoot at a shooting range.

25. I asked HUMPHRIES if the ammunition at his residence was from target shooting. HUMPHRIES said no, and then said, he didn't know where the ammunition came from and that the ammunition had been in the box forever. I asked HUMPHRIES if his paperwork was in the box, with the ammunition. HUMPHRIES responded, no, and then said a lot of paperwork was in the box.

26. On January 31, 2020, TFO Christie received an incoming telephone call on his work cellular telephone from an unidentified telephone number. TFO Chistie answered the call

and recognized the caller as HUMPHRIES. TFO Christie started to record the telephone conversation approximately 20 seconds after answering the call.

27.     During the call, TFO Christie asked HUMPHRIES if he had forgotten that law enforcement recovered ammunition from the residence at 1675 Rockford Street. HUMPHRIES stated, "You found some old shotgun shells from my grandpa. I'm not on federal papers. I don't got a federal case. Like it's shotgun shells. It's been in a box I didn't even know about. It's my grandpa's possession after he passed. You all just threw everything around. It's the last of my grandpa. He was a hunter. Like he died. He had the last shotgun shells. I just held onto them. They're shotgun shells."

28.     TFO Christie asked HUMPHRIES if he previously told law enforcement that he obtained the ammunition at a shooting range. HUMPHRIES replied, "…You asked do I ever touched guns. I said yes. At a shootin range…I go to the shootin range frequently. If y'all followed me, or anything, y'all would know that." TFO Christie then said, "But you know you're a convicted felon and you can't possess firearms or ammunition." HUMPHRIES stated, "I don't possess none of that though. That was my grandpa's possession. It was in a box I didn't even know. My mother gave that to me and I just had that in a shoebox forever. I didn't even know that was in there and my mom told me, yea that was your grandfather's. It's shotgun shells. Not a shotgun. Not a weapon or nothin." Later in the call, HUMPHRIES said to TFO Christie, "We both smart here . . . I kind of one of the smartest . . . there's a lot of violent crime. I done did the violent crime before. Yea I went to jail for my violent crimes. I ain't committed violent crimes since I got out of prison." HUMPHRIES stated that he works out, works, and gambles. HUMPHRIES stated that everyone he grew up with was involved with drugs and guns but said

8

that he is not involved. HUMPHRIES stated, "There's nothing around me. No drugs or nothing. Okay, I had some shotgun shells before. It won't ever happen again . . . not a bullet again…"

## INTERSTATE NEXUS

29. On July 1, 2019, ATF SA John Laurito, a firearms interstate nexus expert, made a determination as to the origin of four rounds of Winchester brand, 12 gauge ammunition, which ATF seized from 1675 Rockford Street. SA Laurito concluded that the seized ammunition was manufactured outside of the State of Ohio. In addition, SA Laurito determined that the examined round(s) and/or component(s) are ammunition as defined under Federal law, 18 USC Section 921(a)(17)(A), and have traveled in interstate and/or foreign commerce.

## CRIMINAL HISTORY

30. I reviewed online documents from the Summit County Court of Common Pleas, which indicated on or about December 1, 2008, HUMPHRIES pled guilty to aggravated robbery, a felony of the first degree, with a firearm specification, in violation of Ohio Revised Code 2911.01(A)(1). HUMPHRIES was sentenced to a three year mandatory sentence for possession of a firearm, and an additional non-mandatory three years for the aggravated robbery, to be served consecutively. A query of Ohio ODRC records indicates HUMPHRIES was in ODRC custody from December 8, 2008 until May 28, 2014.

31. I reviewed online documents from the Summit County Court of Common Pleas which indicated on or about April 28, 2015, HUMPHRIES pled guilty to two counts of aggravated assault, felonies of the fourth degree, in violation of Ohio Revised Code 2903.12. HUMPHRIES was sentenced to an agreed sentence of twelve (12) months, on each count, to be served concurrently. A query of Ohio ODRC records indicates HUMPHRIES was in ODRC custody from May 7, 2015 until January 11, 2016.

9

## CONCLUSION

32. Based upon the above listed facts and circumstances, I assert there is probable cause to believe that:

  A. On or about the June 20, 2019, MICHAEL W. HUMPHRIES did unlawfully, knowingly possess ammunition, in and affecting interstate or foreign commerce, after having been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of Title 18 U.S.C. Section 922(g)(1).

  B. The above violation was committed in the Northern District of Ohio, Eastern Division. I respectfully request that the Court issue a criminal complaint charging the said offense and issue an arrest warrant for MICHAEL W. HUMPHRIES.

_____
Clay R. McCausland, Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

This affidavit was sworn to by the affiant by telephone after a PDF was transmitted by email, per Crim R. 41(d)(3), on this 11th day of February 2020.

Kathleen B. Burke, U.S. Magistrate Judge